1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                 PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                 )
                    Plaintiff,    )   Case No. 3:20-cr-00022-IM
6                                 )
                       v.         )
7                                 )   March 20, 2023
DUSTIN LEE HENDERSON,            )
8                                 )
                    Defendant.    )   Portland, Oregon
9    _____)

10

11

12

13                    SENTENCING

14           TRANSCRIPT OF PROCEEDINGS

15     BEFORE THE HONORABLE KARIN J. IMMERGUT

16        UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                        United States District Courthouse
23                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
24

25                      * * *

```
 1                              APPEARANCES

 2
    FOR THE PLAINTIFF:
 3                             CASSADY ANNE ADAMS
                              United States Attorney's Office
 4                             1000 SW Third Street
                              Suite 600
 5                             Portland, OR 97204

 6
    FOR THE DEFENDANT:
 7                             PER C. OLSON
                              Hoevet Olson, PC
 8                             1000 SW Broadway
                              Suite 1740
 9                             Portland, OR 97205

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

(March 20, 2023)

1

2

3  (In open court:)

4        THE COURT:  Good morning, everyone.  Please be

5  seated.

6     Ms. Adams, if you would call the case, please.

7        MS. ADAMS:  Yes.  Good morning, Your Honor.  This

8  is the time set for a sentencing hearing in United States v.

9  Dustin Lee Henderson.  Case No. 3:20-cr-00022-IM.  My name

10  is Cassady Adams, appearing on behalf of the Government.

11  Mr. Henderson is present, in custody, with his attorney, Per

12  Olson.

13     And with us from the U.S. Probation Department, we have

14  Theresa Fuchs.

15     We're prepared to proceed.

16        THE COURT:  Thank you.

17     Mr. Olson, if you would state your appearance.

18        MR. OLSON:  Good morning, Your Honor.  Per Olson

19  here for the defendant.

20        THE COURT:  All right.  Thank you.  I want to make

21  sure that I have everything that the defense has submitted

22  as well as the Government.  I have the Government's

23  sentencing memorandum, and I have defendant's motion to file

24  the document under seal, which has various photographs.  I

25  did receive a thumb drive on Friday from the defense showing

1    events of -- or surrounding the arrest, which I had seen

2    before, during the course of the --

3                MR. OLSON:  Okay.

4                THE COURT:  -- motions in limine.

5        I don't know if it's the exact thing, but I'd seen

6    similar footage.

7                MR. OLSON:  Okay.

8                THE COURT:  That's now part of the record here.

9        And then I do have also defendant's sentencing

10   memorandum.  Yes.  So ECF 174, and I have reviewed those

11   documents.

12       Is there anything, Mr. Olson, in addition, that you

13   wanted to submit today, other than your argument, and

14   anything Mr. Henderson wants to tell me?

15               MR. OLSON:  No, Your Honor.  But in speaking with

16   Mr. Henderson this morning -- I arrived at the lockup about

17   20 minutes ago -- there were some issues that he presented

18   to me he wanted to bring up that are not really sentencing

19   issues, but they're legal issues that he would like me to

20   address before sentencing is imposed, and so at this point I

21   would ask the Court for a postponement of the sentencing

22   hearing to address these.

23               THE COURT:  What kind of legal issues are you

24   referring to?

25               MR. OLSON:  Sure.  Well, one issue goes to the

1   jurisdiction of the Court.  Mr. Henderson believes that the

2   interstate commerce element was not met in this case from

3   the evidence at trial and based on how it was alleged in the

4   superseding indictment.

5        I haven't had a chance to look at that at all, and so

6   that's -- I wasn't prepared to answer his questions on that

7   or to address it today.

8        Then there was another issue that he raised regarding

9   the Speedy Trial Act and how Mr. Henderson -- there was a

10  delay before he was brought into federal custody following

11  his initial arrest.  And so those are -- those are the two

12  issues.

13              THE COURT:  All right.  Those -- certainly, he's

14  going to have a right to appeal his conviction and

15  sentencing in this case.  I don't think it's appropriate to

16  have those issues raised today at sentencing.  I appreciate

17  your bringing them -- you've, presumably, reserved those

18  issues; but, certainly, I think they're untimely today at

19  sentencing.  So my inclination is to deny a continuance.

20  This case has been -- we tried this case almost a year ago,

21  and there have been numerous delays for a variety of reasons

22  the defense has sought.

23       So here we are, finally.

24       I think for Mr. Henderson to be able to raise the

25  issues, he's going to have to do that on appeal.

1      Ms. Adams, does the Government have any opposition or

2  any position on these issues or whether we should -- I

3  should grant a continuance?

4          MS. ADAMS:  We would object to the Court granting

5  a continuance at this time for the reasons the Court just

6  stated.

7      Mr. Henderson can raise those issues on appeal, as you

8  said; and, additionally, regarding the jurisdictional issue,

9  Mr. Henderson was convicted of Count 1 at trial.  The jury,

10  therefore, found beyond a reasonable doubt that the

11  interstate commerce element was met; and, similarly, the

12  Speedy Trial Act motion is untimely at this time.  So we

13  would just ask the Court to proceed with sentencing today.

14          THE COURT:  Okay.  So I am going to deny the

15  request to continue the sentencing.  I don't believe that

16  it's -- again, I find that those requests are untimely, and

17  so we are going to proceed.

18      Let me ask about the -- start with the presentence

19  investigation report.  It's my understanding, from the

20  parties' respective briefing, that there are no objections

21  to the final presentence investigation report.

22      But I want to confirm with you, Mr. Olson, whether or

23  not -- or how you went about going over the PSR with your

24  client while in custody and whether there are any final

25  objections to the PSR as written.

1    MR. OLSON:  Yes, Your Honor.  I don't -- I don't

2 believe that there are any objections to the final revised

3 presentence report, and I appreciate the fact that

4 Mr. Adamson actually updated the final to add some

5 additional language about his high school graduation and

6 things like that.

7    I sent Mr. Henderson a draft -- the original draft of

8 the presentence report, and we subsequently met at the

9 Columbia County Jail to address those, and we raised, well,

10 legal issues with respect to the first draft, which were

11 actually corrected, regarding grouping and those sorts of

12 things.  And I have subsequently mailed the final version

13 and the revised version to Mr. Henderson for his review.

14    THE COURT:  Thank you.

15    Mr. Henderson, Mr. Olson says that you have had a copy

16 of the presentence investigation report to review.  Did you

17 have -- did you read it yourself, or was it read to you?

18    THE DEFENDANT:  I received it, ma'am.

19    THE COURT:  Okay.  Did you read it?

20    THE DEFENDANT:  I did not.

21    THE COURT:  Did you and Mr. Olson discuss it?

22    THE DEFENDANT:  A couple things.

23    THE COURT:  Okay.  Is there a reason you didn't

24 read it?

25    THE DEFENDANT:  Mr. Olson informed me of most of

1    it.  I felt pretty informed.

2              THE COURT:  Okay.  So you feel like you understand

3    the issues and had a chance to discuss any arguments that

4    you wanted to make at sentencing?

5              THE DEFENDANT:  For the most part.

6              THE COURT:  Okay.  So your lawyer says that the

7    final -- the objections that you and he had were voiced to

8    probation, and changes were made to the report and that

9    there are no final objections to -- or no objections to the

10   final report as written.  That doesn't mean you won't have

11   additional argument on behalf of your lawyer.  He's made

12   arguments in the briefing that are legal arguments and other

13   sentencing types of arguments, but not to the facts as

14   written in the report.

15        Do you agree with him?

16             THE DEFENDANT:  Do I agree with --

17             THE COURT:  That he -- that there are no

18   objections to the final report.

19             THE DEFENDANT:  Mr. Olson said he went through it,

20   and he said it looked good.  He's a professional.  I trust

21   his opinion.

22             THE COURT:  Okay.  So any final objections to the

23   final report from the Government?

24             MS. ADAMS:  No, Your Honor.

25             THE COURT:  Then I'll start by adopting the

1   presentence investigation report as written and all the

2   facts in the report, as well as the guideline calculation in

3   the report, which results in a total offense level of 20,

4   with a Criminal History Category VI, resulting in, for

5   Counts 1 and 2, a guideline range of 70 to 87 months in

6   custody, which must run consecutive to Count 2, which is the

7   924(c) gun count; and on Count 2 there's a mandatory minimum

8   of 120 months, which both parties agree that that is the

9   mandatory minimum that is operative in this case.

10      So that's the starting point for -- in terms of an

11   advisory guideline range for Counts 1 and 2 -- excuse me --

12   1 and 3 is that 70 to 87 months in custody.

13      Why don't I start with the Government.  I understand

14   it's the Government's position that Mr. Henderson should

15   receive 48 months on Counts 1 and 3, to run consecutive to

16   the 120 months on Count 2.  Any argument you would like to

17   make in support of your recommendation?

18          MS. ADAMS:  Yes, Your Honor.  We believe that is

19   an appropriate sentence in this case, considering the nature

20   and circumstances of the offense, which the Court is very

21   familiar with from the trial in this case, as well as the

22   history and characteristics of Mr. Henderson and the other

23   factors set forth in 18 U.S.C. 3553(a).

24      This was obviously a dangerous crime.  Mr. Henderson

25   entered the pub that he ultimately robbed multiple times,

1   appearing to case -- case the place on the date in question.

2   He brandished a firearm to the clerk of the pub and stole

3   five cartons of cigarettes.

4       The most aggravating factor, in our view, was when

5   Mr. Henderson fired off his gun in the parking lot, when he

6   was leaving, carrying off with the five cartons of

7   cigarettes.  This was a public shopping center.  It was the

8   middle of the day.  People were just going about their day,

9   going about their business, and we're very lucky that we're

10  not here on a case where someone was killed because of that

11  bullet.

12      Mr. Henderson was on post-prison supervision at the

13  time this crime occurred.  He has multiple prior felony

14  convictions, as the Court can see from the presentence

15  report, and he was supposed to be getting on the right path.

16  He knew very well that he was not allowed to even have a

17  gun, let alone take his dad's gun and use it to commit a

18  crime.

19      We believe the five-year period of supervised release

20  is appropriate for Mr. Henderson.  That's the period that is

21  allowed for the 924(c) conviction.  Given the history

22  leading up to the date in question, we think five years is

23  necessary to allow him to get reacclimated back into the

24  community whenever he's done serving his sentence.

25      Additionally, there is some restitution that we are

1    requesting.  It's the $314.95 for the cartons of cigarettes

2    that were stolen.  It's pretty reasonable, considering the

3    circumstances.  The victims could certainly ask for more.

4    It's certainly traumatic having a gun shown in your face.

5    Things like that affect someone long after the crime is

6    over.  So the restitution requested is very reasonable, and

7    we would ask the Court to impose that as well.  Thank you,

8    Your Honor.

9              THE COURT:  Ms. Adams, how do you respond to the

10   defense argument that the use of force by the police should

11   be -- at the time of the arrest, using the dog -- and I did

12   observe the video.  I assume you got also a copy of the

13   video again.  What is your position as to whether I should

14   take that into account for sentencing?

15       It appears that the Government -- or the defense has

16   cited some cases that suggest that it's appropriate for the

17   Court to take unlawful police conduct into account, but do

18   you have a position?

19             MS. ADAMS:  I'm not aware of any finding that this

20   conduct was unlawful.  Mr. Henderson can file a civil

21   lawsuit.  I truly don't know if that's been done or what the

22   status of that is.  That's a separate issue.  But we would

23   ask the Court not to give him a lesser sentence on account

24   of that, particularly whenever we haven't presented any

25   evidence regarding the circumstances of why that was

1  necessary.  Again, there's been no court finding, that I'm

2  aware of, that that -- police did anything wrong or that

3  behavior was unlawful.

4          THE COURT:  All right.  Thank you, Ms. Adams.

5      Mr. Olson -- or, actually, before I get to you,

6  Mr. Olson --

7      Ms. Fuchs, I note Probation is recommending a

8  time-served sentence based on a variance for Counts 1 and 3.

9  So it's going to be really just the 121 months.  Is -- I

10  wasn't quite sure I understood what the basis for the

11  variance is other than it sounds like 120 is enough.

12         THE PROBATION OFFICER:  That's correct,

13  Your Honor.  We just think -- he's already served 36 months,

14  and so we think that is sufficient and not greater than

15  necessary, and then just having that be consecutive to the

16  120 months.

17         THE COURT:  All right.  Thank you.

18     Mr. Olson, anything you would like say on your client's

19  behalf?

20         MR. OLSON:  Thank you, Your Honor.  Just picking

21  up that issue that you raised regarding the circumstances of

22  the arrest, there are decisions that say that the Court may

23  depart and consider those sort of conditions when imposing a

24  final sentence.  It doesn't really rest on whether it was an

25  unlawful arrest or whether the conduct of the police

1   officers was unlawful.  The point really was more that he

2   suffered a significant harm in the course of that -- in the

3   course of that arrest, that could, and we say should, count

4   as some form of punishment that he's already suffered, and

5   then that then could effectively lower the sentence that the

6   Court might otherwise have imposed.

7           And so there certainly doesn't need to be a judicial

8   finding or an internal investigation finding that the

9   conduct was unlawful for Your Honor to consider that and

10  lower the sentence accordingly.

11          It's unrealistic that an individual, such as

12  Mr. Henderson, is going to be able to find a civil lawyer at

13  this point.  Certainly, I think the statute of limitations

14  has already run to pursue a claim like this.  It's one thing

15  for protesters downtown who get a little roughed-up by a

16  police officer to file a suit.  Those are frankly more

17  sympathetic to a jury, but a situation involving

18  Mr. Henderson, who's been accused of an armed robbery, you

19  know, being mauled by a dog -- that's not going to perhaps

20  get the same attention to a plaintiff's lawyer that another

21  situation is.

22          So the fact that he might have had some other remedy

23  should not preclude Your Honor from taking that into

24  consideration in imposing a sentence in this matter.

25          It was a very upsetting arrest, very brutal.  You know,

1   his -- if you saw the photographs -- I assume you saw the

2   color versions -- they are quite graphic, in terms of the

3   extent of the injury.

4        And from the video, you know, I would -- I would

5   suggest that it really was unnecessary.  I mean, he wasn't

6   actually under arrest.  They were asking him to come

7   forward.  He was not told, "You are under arrest.  Put your

8   hands up."  He was told to come forward to speak with the

9   officers.  He didn't do that.  He was inquiring about why he

10  was being questioned and why he had been pulled out of the

11  house, but he had not been told that he was under arrest.

12  He was not given commands to put up his hands, and, you

13  know, go down to the ground, or anything like that.

14       So it just hadn't reached the stage where it was

15  necessary to unleash the dog in that circumstance.  So we do

16  ask that the Court lower the sentence due to that

17  circumstance.

18       We have given some other reasons, in my memorandum,

19  Your Honor, for, you know why a variance -- a downward

20  variance is justified in this case.

21       One thing I forgot to mention that the Government

22  reminded me of is that just before trial Mr. Henderson did

23  try, at least, to avoid having to put the Government through

24  the burden of proof by offering to plead guilty and reserve

25  appellate rights -- or plead no contest -- excuse me.  So

there was at least some effort.  That doesn't count for acceptance of responsibility, obviously; but there was at least some effort on his part not to put the Government and the witnesses through the burden.

I didn't have the benefit of being here for trial, and so certainly there's things the Court may have observed that I don't have any insight to.  It didn't strike me, in looking at -- in looking at the transcript and the statements from the main victim in the case, the cashier -- it didn't strike me that she was really seriously affected by this.

Now, I could be wrong, but the way -- her manner of speaking about it seemed to be kind of matter of fact. Like, this was not the most traumatic thing that has ever happened in her life.  She said she was frightened, and certainly the video shows that he was waving -- waving a firearm or holding a firearm up, but he did not point it at her.  And when it came to the actual discharge, he was out of view when the discharge happened.

So, again, obviously, it's a serious offense, but it's not as serious as it might have been.  What was stolen was of very low value.  Essentially, what occurred here was somewhat an active -- an impulsive act.  I mean, there was some planning that occurred with respect to the bag and coming in and out and that sort of thing, but in terms of

1  what was stolen, it just sort of reflects sort of

2  impulsivity and kind of oddness to it, as opposed to a

3  brazen, violent act; and that sort of relates to

4  Mr. Henderson's criminal history as well.

5      When we look at -- you know, you look at it just at

6  face value, he has all of these burglary convictions, three

7  of them, you know, and an Assault 3, which makes it sound

8  pretty bad.  When you peel back the layers there, basically

9  he's going into homes he has some prior relationship with.

10  He's not breaking into stranger's homes and stealing things,

11  and that sort of thing.  It was just sort of an element of

12  rootlessness and about conduct, past conduct, and sort of

13  what he had been going through over the last decade leading

14  up to this.

15      THE COURT:  Mr. Olson, it did concern me that

16  there were violations -- multiple violations of restraining

17  orders involving three different women and threats to kill

18  them.  Some of them, at least.  And that, obviously, is

19  concerning about whether he does have any impulse control,

20  which, as you mentioned, this is a -- was -- this Hobbs Act

21  robbery was -- did seem like somewhat of an impulsive act

22  that involved very, very poor judgment.  But I do have

23  concerns about that criminal history that -- too in terms of

24  your argument that it's overstated, it does seem like a

25  pretty dangerous criminal history, really.

1          MR. OLSON:  Yeah, there are some uncharged

2    incidents that are mentioned in the presentence report as

3    well.  It -- I don't mean to minimize any of that, but it

4    doesn't appear as if anyone was ever seriously injured or

5    injured.  I mean there were some threats, but it hasn't

6    really -- it hasn't really gotten to really seriously

7    injuring anybody; so --

8          THE COURT:  I think one of the women said he had

9    broken her nose, if I remember correctly.

10         MR. OLSON:  Right.  I think that's right.

11      So it is what it is.  It's domestic -- domestic

12   abuse-related issues.  I just -- that's -- again, I don't

13   mean to minimize anything, but it's not -- you know, again,

14   you look at it as criminal history at first glance, you

15   might think people is just brazenly breaking into everyone's

16   homes to steal things.

17      And, of course, the Assault 3 looks bad, but then you

18   realize that's just a bad car accident at age 17.  So

19   somehow that resulted in three criminal history points.

20      So, now, I didn't intend to say that it's so overstated

21   that he belongs in a criminal history category.  I just -- I

22   mean, it's just -- that it's a consideration.

23         THE COURT:  Mr. Olson, before I have you continue,

24   I did have just a question for the Government, just what

25   the -- the Government is seeking a variance also downward

1    from the advisory guideline range.

2          What's the basis for the variance?

3          MS. ADAMS:  Thank you, Your Honor.  It's similar

4    to the Probation Department's request for a variance, but

5    not to the extent that Probation is recommending.

6          Essentially the 924(c) discharging of a firearm we felt

7    was the most aggravating charge in this case.  It is

8    basically what elevates what would otherwise be a

9    misdemeanor theft case to a federal case -- because of the

10   firearm, because of how it was used in multiple ways.  You

11   know, it was shown to the clerk, brandished, and then it was

12   discharged.

13         So we felt like that charge fully encompassed the

14   defendant's conduct and appropriately punished it, and just,

15   basically, the guidelines sentence just would be overly

16   punitive, considering that ten-year consecutive sentence

17   that Mr. Henderson will have to serve.

18         THE COURT:  Okay.  Thank you.

19         MS. ADAMS:  Sorry.  Your Honor, if I may respond

20   to a couple of arguments as well whenever -- if I can have

21   time after Mr. Olson is done.

22         THE COURT:  I'll let you respond now because then

23   I do want Mr. Olson and Mr. Henderson to have the last word.

24         So go ahead.

25         MS. ADAMS:  Just on the dog -- I don't want to

1   make this about the dog, but there was -- at the time the

2   dog bite incident occurred, law enforcement still didn't

3   know whether Mr. Henderson was armed, and there had just

4   been an armed robbery.

5       So, you know, the dog bite is certainly not great for

6   anybody involved.  No one enjoys that that happened, but

7   this could have easily evolved into a law enforcement

8   shooting.  Either Mr. Henderson getting shot, if he made

9   some kind of gesture towards a gun, or an officer getting

10  shot.  This was a very intense situation that had just -- an

11  armed robbery had occurred.

12      So to the extent the Court wants to take that into

13  account, when considering whether to give a variance based

14  on the dog bite, we think it's important for you to also

15  consider the circumstances of what had just happened and the

16  fact that we didn't know where the gun was at that time.

17          THE COURT:  Thank you.  Mr. Olson, we're back to

18  you.

19      Any additional argument?

20          MR. OLSON:  On that point, Mr. Henderson's father

21  had come out of the trailer, and they had questioned him,

22  and it was his gun and -- I'm trying to remember the

23  sequence of events, whether they had specifically asked him

24  about the firearm when he was out of the trailer, but

25  certainly there was an ability to simply ask Mr. Henderson's

1   father about the gun, and so I -- I don't think it needed to

2   come to that, where they were deploying the police dog to

3   pull Mr. Henderson to the ground.

4        The only thing I would just --

5             THE COURT:  I think the gun was missing at that

6   stage, however, because I think the evidence was then during

7   the search the officers found the gun in a cabinet, which is

8   different than where the father, Larry, had left the weapon.

9        So even -- and, again, none of us know.  I don't know

10  what transpired, really, leading up to the arrest, but in

11  the interview with Mr. Henderson's father, I believe that

12  the gun was still missing.

13       Am I wrong on that, Ms. Adams?

14            MS. ADAMS:  I don't know when sequentially exactly

15  he was interviewed, but he ultimately let the officer back

16  into the house to show the officer where he put the gun

17  because he noticed when he got -- he noticed that it was

18  missing around the time Mr. Henderson came home, and then he

19  got a call from the neighbor saying, "The police are outside

20  your house.  There's been a robbery," or something to that

21  effect.

22       But my understanding, from the evidence, is that at the

23  time the dog bite occurred, it was an evolving situation.

24  They still didn't know where the gun was.  It -- who --

25  whose gun it was.  They're still trying to figure this out

1    and still trying to do their job the best they could.

2             THE COURT:  But they didn't have possession of the

3    gun at that time?

4             MS. ADAMS:  That's correct.

5             MR. OLSON:  So paragraph 16 of the presentence,

6    Your Honor, says that Larry, the father, Larry Henderson,

7    his son -- he tells the police that his son comes home and

8    says that he brought some cigs home, and then it was a

9    little later that a neighbor called him and said that there

10   was an armed robbery in the area, and Mr. Henderson thought

11   about it for a second, and then went to check for his

12   firearm, and he noticed it was gone from where he normally

13   kept it, and then -- so he looked for it; and then, in

14   paragraph 17, it says that he finds the gun, and he puts it

15   in a different spot in the kitchen, in a drawer, and that's

16   where it's ultimately found.

17       So it wasn't when -- when the deputies arrive and they

18   search the house, it was not missing, as far as

19   Larry Henderson was concerned.  He found it and put it

20   somewhere else.

21       So it was -- it was not on Mr. Dustin Henderson's

22   person, certainly, by the time he was being confronted by

23   the deputies on his front porch.  So it was not missing.  It

24   was in the house.

25             THE COURT:  Thank you for pointing that paragraph

 1 | out.
 2 |         THE MR. OLSON:  So, Your Honor, just the last
 3 | thing is, of course, the COVID argument.  I know it's
 4 | been -- not all judges, but several judges, I think, have
 5 | decreased sentences in light of the pandemic conditions that
 6 | pretrial detainees have experienced over the last three
 7 | years, and so Mr. Henderson has lived through all of that,
 8 | and so I would just ask you to consider that as well in the
 9 | sentencing.
10 |         THE COURT:  All right.  Thank you, Mr. Olson.
11 |     Mr. Henderson, this is your opportunity to say anything
12 | you'd like regarding your sentencing.  So I'm happy to hear
13 | from you.  You're not required to speak if you don't want
14 | to.
15 |         THE DEFENDANT:  I have no further -- I have no
16 | comment, Your Honor.
17 |         THE COURT:  Okay.  Thank you.
18 |     Obviously, I did sit through the trial in this case,
19 | and it is -- and watched it unfold and watched the witnesses
20 | testify, including the victim witness, and I do find that it
21 | was a scary situation for her and for the folks and -- as
22 | the defendant ran into the parking lot and was chased, but
23 | then a shot rang out, and all evidence tied to the defendant
24 | being the person who shot the gun.  The firearm, when found,
25 | had a round in the chamber, as I understand it, and was

1    fully loaded.  And so all of those factors demonstrate the

2    danger -- dangerousness of the situation, even though,

3    again, terrible judgment to go steal some cartons of

4    cigarettes, it seems to me, but that is what happened in

5    this case.  So the defendant is unfortunately faced with a

6    mandatory minimum of 120 months on Count 2.

7        Having reviewed all of the pleadings and the argument

8    about the use of force, I do not find that I can

9    appropriately take the use of force into account in this

10   sentencing because there are too many unknowns.  I have not

11   heard the audio leading up to the arrest.  I didn't have

12   testimony about the circumstances leading up to the arrest,

13   and -- but I am -- as we discussed it in the motions in

14   limine, the Government said there was a rationale for why

15   the officers applied that use of force.  There was certainly

16   a gun still in the house that had been shot earlier --

17   really, shortly before the police confronted Mr. Henderson

18   at the residence.  So there may be legitimate grounds for

19   use of force under the circumstances.  So I don't think it's

20   appropriate without litigating the facts more and having a

21   more robust record on that to consider that for purposes of

22   sentencing, and I don't find on this face that -- on the

23   face of it, that it was necessarily an unreasonable use of

24   force.  So I don't think it's appropriate here.

25        With regard to the hardship presented by COVID, I think

1  the -- a variance does take that into account; so I do find,

2  although the guidelines would give Mr. Henderson somewhere

3  between 70 to 87 months on Counts 1 and 3, that the time

4  recommended by the Government does seem sufficient but no

5  greater than necessary to accomplish the purposes of

6  sentencing, such as deterrence, both general and specific.

7  It takes into account the nature and seriousness of the

8  offense, the defendant's criminal history, and I think it

9  also takes into account the -- part of the difficulty that

10 it has been for folks in custody now under COVID.

11      Now, I am mindful that Mr. Henderson has asked for

12 numerous continuances, numerous new counsel; so the delays

13 in this case were largely due to Mr. Henderson; so that's --

14 that's why it's hard to give it too much of a break based on

15 the COVID factors here, and the -- and it is somewhat of an

16 arbitrary issue and I -- I know that in some cases judges

17 are granting it, but since all of the folks in custody are

18 suffering through the same thing, it's hard to know what is

19 really suitable in terms of downward variances to afford

20 that.

21      So mostly I apply the variance for the -- a sentence

22 that is sufficient but no greater than necessary.  I do note

23 that defendant has never demonstrated any remorse for his

24 conduct in this case.  That's captured on the video.  It's

25 captured -- obviously, we were -- we went to trial on this

1   issue.  He litigated motions and never once showed any

2   remorse for carrying a firearm and discharging it, being --

3   robbing a young -- or a woman at a store and putting a lot

4   of lives in danger; so I do take that into account.

5         His history on supervision also is poor.  He was on

6   post-prison supervision at the time, and I note, as set

7   forth in the PSR, the defendant was on release from his

8   post-prison supervision on January 23, 2019, almost

9   immediately absconds, is picked up in October of 2019, is

10  then released, and shortly thereafter, he's arrested for

11  this case.

12        Again, he's arrested with a firearm that was loaded

13  with a round in the chamber.  So for protection of the

14  public, I think a serious sentence is warranted, and I do

15  note that his prior crimes do involve violent behavior and

16  the -- as well as the issues with violating restraining

17  orders, which suggests that he does not adhere himself to

18  judicial orders.

19        So I will impose on Counts 1 and 3, 48 months in

20  prison, concurrent with each other, but consecutive to 120

21  months on Count 2.  On Counts 1 and 3, there are three years

22  of supervised release; and on Count 2, I'll impose five

23  years of supervised release, subject to all of the

24  conditions -- the mandatory conditions, the standard

25  conditions 1 through 13 adopted by this Court, and the

1    special conditions that are recommended -- all on pages 3

2    through 5 of the presentence investigation report sentencing

3    recommendation, which is ECF 176 sealed document.

4         I'll order a $100 fee assessment on each of the counts.

5    And with regard to the restitution, I will order $314.95 to

6    the victim in this case.

7         Is there anything I neglected to mention from the --

8         Oh, Mr. Henderson, you do have a right to appeal your

9    conviction and sentence in this case if you feel you have a

10   basis to do so.  If you do file a notice of appeal, it must

11   be filed within 14 days.  And if you can't pay the cost of

12   an appeal, you may apply for leave to file an appeal in

13   forma pauperis.  And if you so request it, the Clerk of the

14   Court will prepare and file a notice of appeal on your

15   behalf, but that that must all be done within 14 days of

16   today, because today is when I'll issue the judgment for

17   you.

18        Are there any issues or any clarification or anything I

19   neglected to mention from the Government's perspective?

20             MS. ADAMS:  No, Your Honor.  And I have a

21   specific -- there's an entity who the restitution needs to

22   be paid to.  I can email that to Mr. Yerke to be put in the

23   judgment.

24             THE COURT:  Thank you.

25        Mr. Olson, anything from your perspective?

 1                    MR. OLSON:  May I have just a second.

 2                    THE COURT:  Of course.

 3                    MR. OLSON:  Nothing further, Your Honor.

 4        I will file the notice of appeal on Mr. Henderson's

 5    behalf.

 6                    THE COURT:  Thank you.

 7        Any clarification or any issues from probation?

 8                    THE PROBATION OFFICER:  No, Your Honor.  Thank

 9    you.

10                    THE COURT:  All right.  Then we'll be in recess.

11                          (Hearing concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

United States of America v. Dustin Lee Henderson

3:20-cr-00022-IM

Sentencing

March 20, 2023


        I certify, by signing below, that the foregoing is
a true and correct transcript of the record, taken by
stenographic means, of the proceedings in the above-entitled
cause.  A transcript without an original signature,
conformed signature, or digitally signed signature is not
certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Official Court Reporter        Signature Date: 7/17/2023
Oregon CSR No. 98-0346         CSR Expiration Date: 9/30/2023